(53 South. 550.)

No. 18,334.

ROUX v. MORGAN'S LOUISIANA & T. R. & S. S. CO.

(Oct. 31, 1910. Rehearing Denied Nov. 28, 1910.)

*(Syllabus by the Court.)*

MASTER AND SERVANT (§ 243*)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where a car repairer goes to work on a car, on a railroad track, without putting out proper signals, with which he is provided, and the use of which he knows, to prevent collision by other cars, whilst he is so engaged, there can be no recovery of damages for injuries sustained by him. The fault is his.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 773; Dec. Dig. § 243.*]

Appeal from Twenty-Eighth Judicial District Court, Parish of St. Charles; Prentice E. Edrington, Judge.

Action by Mrs. Adele Roux, widow of Jean Torres, against Morgan's Louisiana & Texas Railroad & Steamship Company. Judgment for plaintiff, and defendant appeals. Reversed, and suit dismissed.

Alfred E. Billings, for appellant. W. J. Waguespack, G. A. Gondran, and L. Robert Rivarde, for appellee.

MONROE, J. Plaintiff, as the dependent mother of Louis M. Torres, deceased, brings this suit to recover damages for injuries to, and the death of, her son, resulting, as she alleges, from the negligence of the defendant company, by which he was employed. Defendant, for answer, says that the injuries sustained by the decedent resulted entirely from his own negligence, or, in the alternative, from his contributory negligence.

The case disclosed by the testimony is as follows:

The decedent was about 21 years old, and had been, for four years, employed by defendant as carpenter and car repairer. He had been, for one month, at Boutté Station, engaged in repairing cars, on the side track at that point, and was so engaged when he met with the accident out of which this suit has arisen. The main track runs, approximately, east and west, and the side track runs parallel to it, on the south side, upon which side, also, is the station house. Near the station house, a public road crosses the tracks, and is known as "Tinney's Crossing." To the westward about 500 feet, there is another crossing known as "Laque's Crossing," and, near there, at Laque's house, Torres and a fellow workman, named Bergeron, were boarding. The side track extends eastward, beyond Tinney's Crossing for a distance of some 1,300 feet or more, where it is connected by what we will here call the "eastward switch" with the main line, and it extends to the westward of Laque's Crossing, for a considerable distance, to a point called the "halfway switch," which connects it with the main line, from which it then branches out again and is continued still further to the westward until it is again connected with the main line, by what may be called the "westward switch." On the day of the accident, and for some time before, the side track, between Tinney's Crossing and the eastward switch, and between the two crossings, had been pretty well filled with flat cars, and there were, also, on the day of the accident, similar cars between Laque's Crossing and the halfway switch, all of them subject to inspection and repair, and Torres and Bergeron had been working, sometimes on one car and sometimes on another, and for their protection, whilst so engaged, as they frequently worked underneath the cars, they were provided with blue flags, attached to three-eighth inch iron rods, as staffs; the length of the staffs being variously stated at from 4½ to 7 feet, and defendant's rule concerning the use of the flags reading as follows:

"A blue flag, by day, and a blue light, by night, displayed at one or both ends of an engine, car, or train, indicates that workmen are under or about it. When thus protected, it must not be coupled to or moved. Workmen will display the blue signals and the same workmen are alone authorized to remove them. Other cars must not be placed on the same tracks so as to intercept the view of the blue signals, without first notifying the workman."

It is not shown that this rule was ever specifically brought to the notice of Torres, or that he was furnished with a copy of the book of rules in which it is contained; but it was shown that he had been in defendant's employ for four years, and that he was given time cards, bearing the printed notice, which, at the beginning of his employment, was read to him by one of the officers of the defendant company, to wit:

"Examine, personally, scaffolding, tackle, and all other appliances before trusting them.
"If your duties require you to go around, under, or on cars on any track, protect yourself with blue signals."

It was also shown that they were provided with three blue flags, and we think it may reasonably be inferred that they knew what they were intended for. On the morning of June 19, 1906, the two men left Laque's house (where they were boarding), Laque says about 7 o'clock, Bergeron says about 8:15 or 8:30, to go to their work. Laque says they carried their tools with them and two flags. Bergeron says they carried their tools, and that he carried two flags, but that he is unable to say whether Torres carried a flag on that morning, or not, though their custom was to carry three flags; one of them, sometimes, carrying two, and the other, one, and vice versa. Bergeron went to work to the westward of Laque's Crossing. Torres went

to the eastward. Laque, who is plaintiff's witness, says:

"Both of them were boarding there (at his house). And that morning they went to work at 7 o'clock. They eat their breakfast, and I saw both of them pass through the store about 7 o'clock. They walked out with their tools and flags. I walked out as far as the gallery that we have, and this young man that got hurt —Torres, I believe his name was—he went toward the east end of the switch, with his tools and flag, and the other man, he went to the west, at the other end; and it must have been between 8 and 9 o'clock that this young fellow, the one that got hurt, he came back in front of my store, at the corner—that is where he put his tools—and he stopped working, and I was talking. Then he went to work, and, while he was working there, a little while, I went into the store to wait upon some one, and I was there about 20 or 30 minutes, and, all at once, I heard my mother hallooing about a man being run over," etc.

It is undisputed that, when he was injured, Torres was working under one of the cars near Laque's store, between Laque's and Tinney's Crossings, and that the injury was brought about as follows: Local freight train No. 53 (consisting of an engine, six cars, and a caboose, and of which Feahney was conductor; Moymagh, engineer; Drumm and Brechtel, brakemen; and Trudeau, flagman), moving westward, and, acting under orders to go into the side track, so that through freight train No. 246, moving eastward, might pass on the main track, entered the side track at the eastward switch, and, within a car length of the distance required to clear the main track, came upon a string of flat cars, extending from that point to Tinney's Crossing, which it was necessary for it to push forward in order that it (train No. 53) should clear the main track. The first car of the string was, accordingly, coupled, to the front of the engine, and, Brechtel having gone forward and given the signal to "come ahead," the train moved forward and pushed the string of flat cars to which it was already coupled over the crossing, to the string on the westward, and the latter, in turn, was put in motion, with the result that Torres, who was working underneath one of them, received the injuries from which this suit has arisen. No one pretends that there was any blue flag between the eastward switch and the flat car nearest thereto, and it is shown by undisputed testimony that that was a place for such a flag. There was a "cut," or space, somewhat wider than the public road, at Tinney's between the strings of flat cars that were on either side of the crossing, and the contention, on behalf of the plaintiff, is that Torres had planted a blue flag there, in the middle of the side track; that Brechtel gave the signal for the train to move forward before he reached the crossing, and hence did not see the flag; and that the cars were pushed over it. The testimony relied on to support this contention is that of Johnson and Manuel, two old negro men, who say that they saw the flag, at the point mentioned, and saw the cars roll over it. On the other hand, Brechtel and Drumm the brakeman, Feahney, the conductor, and Zimmerman, the fireman, of train No. 53, testify that, when the train entered the side track, Drumm coupled the engine to the first flat car at the end of that string of cars, and then took his position on it in order to pass to the engineer (Moymagh) the signal to be given by Brechtel, who, in the meanwhile, walked forward, on the ground, between the main and side tracks, until he reached the crossing, from which point he gave the signal "come ahead," which Drumm repeated to the engineer, whereupon, and, only then, the train moved. Brechtel further testifies that there was no flag at the crossing, and that, had there been one, he must have seen it. Moymagh (the engineer) says that, as he was looking to Drumm for the signal, he did not observe where Brechtel was when he signaled to Drumm, but he corroborates the others, to the effect that Brechtel had walked forward for the purpose of making the

coupling, at the crossing, and he supposes that he did so. It is undisputed that through freight train No. 246 was pulling in on the main track when the accident occurred, and that Torres was almost immediately put into the caboose and carried on to New Orleans (whither the train was bound), to the hospital. We infer that he had been crushed, as the injuries from which he died, four days later, appear to have been internal, and there is no suggestion that the wheels of the car passed over him. The first impression appears to have been that he was not fatally injured, and he conversed with those about him. Brechtel rendered assistance and says that, in answer to his questions, Torres replied that he was to blame in the matter; that his flags were in the material (or tool) car. And Brechtel further says that he looked in the material car and found two blue flags. Maelin, brakeman on train 246, testifies that he heard Torres, after he had been put in the caboose, say that he was to blame; that he failed to put out his flags; and that they would be found in the tool car. Martinez, conductor on train 246, says that, after Torres had been put in the caboose, he asked him about his flags, and that Torres said that there was one to the westward but none to the eastward. Feahney, conductor on train 53, testifies that he called to see Torres at the hospital the second day after the accident, and that Torres told him that it was his fault; that he had told Bergeron to put out the flags; but that Bergeron had not done it. Brechtel, Drumm, Feahney, Zimmerman, and Moymagh (all of the members of the crew of train 53, save Trudeau) testify that they saw two blue flags in the material car. Bergeron testifies that he placed one of the flags, that he took out, to the westward of the halfway switch, and the other, to the eastward, both of them to the westward of the place where he was working; that he and Torres had three flags between them; that sometimes he took one and Torres two, and at other times he took two and Torres one; and that they always carried the flags, with their tools, back to their room at night. On the other hand, Harvey, who was engineer of a work train which had been operating at Boutté while Bergeron and Torres were there, and who saw the two men constantly, says, in his testimony, that Torres usually threw his flag into the tool car, after supper, and that, at times, he threw it down beside the track. There is no doubt that Bergeron had placed a flag between himself (or where he worked) and the halfway switch, as Harvey testifies that he (Bergeron) put it behind his (Harvey's) caboose and called his attention to it. We are satisfied, however, that he did not place a flag to the westward of the halfway switch, for, in the first place, with the flag to the eastward of that switch, such a flag would have served no useful purpose; and, in the next place, if he had put one there, Harvey would not have been able to get out and in with his dirt train. Our conclusion, then, is that Bergeron had but one flag, as Laque testifies, on the morning of the accident. The question, then, is: Where were the other two? It will be remembered that, after the accident, two blue flags were found in the tool car. The learned counsel for the plaintiff, proceeding upon the assumption that Bergeron had started out with two flags, and Torres with one, which (according to their view) he placed at Tinney's Crossing, argue that the presence of those two flags in the tool car can be explained only upon the theory that Brechtel, feeling that he was culpable in signaling train No. 53 to move ahead before he had reached the crossing and had put himself in a position to see the flag, which they think Torres had placed there, conceived the idea of gathering up the flags that he could find, putting them in the tool car,

and then calling the attention of the train crew to them, thereby preparing a case of exoneration for himself and providing witnesses to establish it. With regard to the testimony as to Torres' admissions, the suggestion is that Brechtel has sworn falsely, in his own interest, and that Martinez and Maelin, of the crew of train No. 246, have sworn falsely in order to shield from blame, or trouble, a fellow workman, or, as we understand it, a member of the same labor organization. The contention of the learned counsel seems, also, to involve an imputation of false swearing against Feahney, Drumm, and Zimmerman, and a charge to that effect is made, in so many words, against Harvey, of whom counsel say in their brief:

"Harvey's testimony is demonstrated to be utterly unworthy of belief, for he deliberately swears that Torres brought his tools to his boarding house at night, but put his flag in the material car, and that he saw Bergeron and Torres throw their flags into the material car 40 or 50 times; all of which was false, because he admitted that he always returned to Boutté late at night, and defendant's own witness Bergeron swears that Torres and himself would bring their flags home every night, and in this he is corroborated by Laque, Johnson, and Manuel, who swear that they saw them bring their flags home every night."

Harvey, as engineer of the locomotive, was operating a dirt train in and out of the side track at Boutté, and, as we infer, had constant occasion to handle the cars upon which Bergeron and Torres were at work. He, therefore, of all others, was likely to have known how they used their blue flags, since, unless they were properly used, he might at any time have run his engine into a car on which they were working and have injured or killed them. His testimony upon the subject reads as follows:

"Q. Now, do you know where Torres kept his flag when he quit work at night? A. Usually threw it in the tool car, after supper. Q. You know that of your own knowledge? A. Yes, sir; I saw it. I have seen them throw them there. Q. Did he always throw it there? A. There were times when he would throw it down

alongside of the track. * * * Q. How long had the car been there? A. That was there two days before those boys came there. They came with material—bolts, drawbars, shoes, everything that they use, and that remained there in the meanwhile. * * * Q. Did their tools remain in there? A. They kept their tools in their room. Q. Did they take their flags to their boarding house? A. I don't know. Q. You didn't go to their boarding house? A. I was boarding at Tinney's. I have often seen them throw their flags in the tool car. Q. When? A. At various times to my knowledge; I guess some 40 or 50 times. I wasn't there all the time. I know I've seen them throw their flags in the tool car. Q. How often? A. Some 40 or 50 times I have seen them take their flags up at dinner time and throw them in the tool car, and at night too. I wasn't present every night when they knocked off. Q. How often in the week were you there? A. Every day. Q. How late at night? A. I slept there. Q. You got there late at night? A. Yes, sir. Q. After they had gone off? A. Some days I would be away all day, and some days I wouldn't come back until 9 or 10 o'clock at night."

We find nothing in the testimony thus quoted that appears to be either improbable or inconsistent. On the contrary, it seems to us highly improbable that Bergeron and Torres should have taken their flags with them to dinner every day, and highly probable that they should have thrown them into the tool car at that hour, and, also, that they should have thrown them into the tool car at night, if they expected on the following day to go to work in the neighborhood of the car; whereas, if they expected to go to work at the other end of the side track, they would, no doubt, take the flags to their boarding house. Their tools they always took with them, because the car was open and they were liable to be stolen.

Bergeron testifies (in part) as follows:

"Q. What time did the accident occur? A. About 9:30. Q. Which way did you go? A. West. Q. Which way did Torres go? A. To the east end. Q. Did he carry anything? A. I don't recollect whether he did or not; I didn't see anything. Q. How many flags did you have? A. Me, personally, I had two. Q. How many did he have? A. I don't know how many he had. Q. Did he have any flags at all? A. We had three flags altogether; I don't know whether he took one or not. * * * Q. You never had more than three flags? A. Yes, sir. Q. Two of them were in your possession? A.

Yes, sir.  Q. All the time.  A. Sometime, but not all the time.  Q. Sometimes Mr. Torres had two, and sometimes you had two?  A. Yes, sir. * * * Q. Now, on that day you were using two flags?  A. Yes, sir.  Q. And Mr. Torres was using one?  A. Yes, sir.  Q. Where did Mr. Torres usually put his flag?  A. I don't know what he did with them.  Q. You saw him leave with his flags in the morning?  A. No, sir.  Q. Not that morning, but before that? A. Yes, generally, I did.  Q. Generally he carried his flags with him?  A. Well; yes, sir. * * * Q. On that morning, you don't know whether he had any flags at all?  A. No, sir. * * * Q. Did Mr. Torres go out with his flag every morning?  A. Usually; yes, sir."

On further cross-examination, the witness was induced to say that Torres carried his flag or flags with him every morning; but we think the sense of his testimony is to be found in the above excerpt.  We take the following from the summary, given by plaintiff's counsel in their brief, of the testimony of their principal witness, Johnson, to wit:

"With a great deal of particularity he points out, on the sketch in evidence, the exact spot where the flag stood; says that the flag was (on) an iron rod, six or seven feet high, and rose about one and a half feet above the flat cars, and that there was, between the flag and the first flat car, east, an open space at least ten feet wide; that on the east switch there were about 12 or 13 cars. * * *

"Witness saw Bergeron and Torres, during one month, pass near his house, almost every morning, after they came out of their boarding house, on their way to their work, and each carried his box of tools on his shoulder and each carried his flag, or flags, in his hand."

The evidence shows that Johnson lives on the north side of the railroad tracks, apparently about midway between lines projected from Laque's and Tinney's stores, which are both on the south side, and, say, 500 feet apart.  The side track on which were the cars that Bergeron and Torres worked on is probably half a mile long, from the eastward, to the halfway, switch, and extends westward beyond the halfway switch to the westward switch.  It was therefore impossible that they should have passed near the house of the witness almost every day in going from Laque's where they boarded, to their work.  But, if they had done so,

Johnson, a mere negro laborer, had no interest in observing what they carried in their hands, and his attempt, two years after the accident out of which this case arises, to state what they carried, almost every day, and, upon the basis of observations made whilst he and Manuel and another negro were idling and gossiping about Tinney's store, "with a great deal of particularity," to testify to the exact spot where the flag stood, and the distance between it and the nearest cars—matters of no sort of consequence at the time, and in which he had no manner of interest—is enough of itself to cast a doubt upon the reliability of his testimony, which, however, is otherwise so full of contradictions and inconsistencies as to suggest the idea that the witness does not really know that truth is an important element in the giving of testimony.  In his original examination he insisted on it that the flag that he saw was green; that it was not blue; that he was not color blind, and knew the difference between blue and green.  He came back and corrected the testimony so given by saying that the flag that he saw was blue, and explained that he did so because, after testifying, he had seen some other flags (two years after he had seen, as he says, the flag concerning which he testified); and he was then questioned and answered as follows:

"Q. And you are now stating that that was a blue flag, from what you have seen of other flags since?  A. Yes, sir.  Q. And not from your recollection?  A. Not from my recollection."

In other words, having sworn, as from his recollection, that the flag that he saw was green, and, having afterwards seen some flags that he was probably informed were the kind used by car repairers, he was willing, on that basis, and not from any refreshing of his memory, to swear the flag that he saw was like them.  He stated in his testimony that he was unable to read,

and, a few pages further on, that on the morning of the accident he went home and wrote a letter, which he put in the post office. He said:

"I passed him (Torres) during the morning when he was working there, coming from Mr. Láque's store."

On the next page, being asked whether he had seen Torres when he left his boarding house, he replied:

"No, sir; because they had breakfast, and I went home, and when I came back he was working under the car."

His counsel, in their summary of his testimony, say (and we have no doubt that they are correct, though we have not verified their report):

"Johnson swears * * * that, about an hour prior to the accident, he left his house, to go to Tinney's store, and passed by the spot where Torres was working, under a flat car; that he saw him under the car, screwing bolts; and that, on his way to Tinney's store, he also passed by the depot and saw a blue flag sticking up, in the middle of the switch track, right in front of the colored portion of the waiting room of the depot."

He therefore tells three different stories as to seeing Torres at work (for it is not pretended that he saw him three times): One, that he saw him when he (the witness) was coming from Laque's store; another, that he saw him when he (the witness) was coming back from his house, to Laque's store; a third (as reported by his counsel), when he (the witness) was on his way to Tinney's store, which is in another direction. He says, also (as quoted above), that in going from his house to Tinney's store he passed Torres at work, and also passed the depot, where he saw the flag. But Torres was at work near Laque's, which is far to the westward of Tinney's, whilst the place where the witness locates the flag is to the eastward of Tinney's, and he could not reasonably

have passed both points in going from his house to Tinney's. In fact, there appears to have been no occasion for his passing either. He professes to have been present when Torres was taken out from under the flat car, and he testifies that he was put on train No. 42, which (he said) came along about an hour later. The fact is that train No. 246 was pulling into Boutté station when the accident occurred, and Torres was put aboard of it, almost immediately; and it seems to us remarkable that a witness, who, having at the time no interest in so commonplace a matter, should have noticed the exact spot where a little flag stood and its exact distance from a particular car, should have stood by when a badly hurt man was drawn from under a car, and yet not know that he was almost immediately placed in the caboose of a freight train that was then coming to a stop alongside of him. That he did not know that fact, however, afforded no reason why he should have testified that the man was put on another train at another time.

Recurring, then, to the question how did the flags get into the tool car, we think the answer is that they were left there by Torres, the night before, and remained there until after the accident. And that is, in effect, the answer to plaintiff's demand; for, whatever might be said of his failure to put the flag at the eastward switch, which was the proper place, as he put none either there or at the crossing, there is no basis whatever upon which the defendant can be held liable.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there be judgment in favor of the defendant herein, rejecting plaintiff's demand and dismissing this suit at her cost.