Statement of the Case.
MONROE, C. J.
This is an appeal, by defendant, from a verdict and judgment awarding plaintiff $5,000 for the loss of a leg; the case as presented by the petition and evidence being as follows:
The accident which resulted in the loss thus mentioned occurred about half past 2 o’clock p. m., on February 20, 1914, whilst plaintiff was engaged in inspecting a certain “Rock Island” car, which had been “tagged”as in bad order and was one of a number that were standing on defendant’s switch or side track No. 2 in its yards at Shreveport. Plaintiff was, at that time, 43 years of age, had been an inspector and repairer of cars for 20 years, and employed by defendant in that capacity for say, 4 years; his position being rather an independent one, in that, though he was subject to the orders of the “car foreman,” the situation was such that he was, generally, left to determine for himself what his duties required and the manner of their discharge and received few specific instructions. The foreman had charge of the work of repairing cars, whether done on the “rip track” (being a particular track set apart for the making of repairs which do not require the sending of the cars to the shops) or in the shops, but he spent most of his time in the shops — going into the yards perhaps once a week. In order to determine whether cars needed repairs, and whether the repairs were such as could be made on the “rip track,” or as to require that the cars be sent to the shops, inspections were necessary, and, as they were to be made wherever the cars were found, that work was left to the plaintiff, as was, no doubt, some of the repairing. Being asked, on cross-examination, “You are the boss of your department?” he replied, “Yes, sir;” and it is shown that he was allowed an assistant, who was subject to his orders, which position was, at one time filled by a young man named Kelly, and at the time of the accident by a young man named Meyers, who was called as a witness for plaintiff and testified in this case. It is alleged, in the petition, that it was plaintiff’s duty to inspect the car in question and make such repairs as were needed; that in the discharge of that duty he placed himself “between the bottom of said car and the top of the wheels or trucks under the end of said car, for the purpose of examining and repairing * * * the center pin”; that while so situated, defendant, without notice or warning to him, “carelessly and negligently switched, or shoved, with its locomotive, a number of other cars against and into the cars standing on said switch, * * * and against and into the car under which plaintiff was working and inspecting, by severe and negligent contact with the car next to it,” thereby throwing him “from the top of the trucks, in front of them and on the rails, or track, before the wheels, and negligently causing said trucks and wheels to pass over and across” his left leg, cutting it almost in two, below the knee; that he was so situated at the time “that he could not see or hear the approach of the cars that were thus shoved against the string of standing or dead cars,” of which the car under which he was working was one, and no signal of such approach was given, nor was there any flagman or other person upon the approaching cars to give warning of their approach. We are thus particular in stating the cause of action, as alleged in the peti *197 tion, for the reason that it differs materially from a statement made by plaintiff shortly after the accident, and the further reason that on the trial, some evidence was adduced for the purpose, apparently, of showing that plaintiff had been led to believe, by some saying attributed to the yardmaster, that no cars would at that time .be sent down on track No. 2, and hence that he would be safe in making his inspection of the Rock Island car as he was making it when injured.
The evidence does not enable us to say whether the different tracks that are referred to in the testimony run north and south, east and west, or otherwise; but we shall assume, in order the more conveniently and intelligibly to describe the physical situation, that they run north and south. Proceeding upon that assumption, there is a switch upon the north side of the yards which leads from the main track into the “rip track” which lies on the west side of the main track, and, a little farther down, there is another switch, leading from the main track into a track on the east side, known as the “scale track,” also known as “track No. 2,” upon which, about 250 feet south of the switch, there is a scale for the weighing of cars, and to that part of which, extending below the scale, the term “track No. 2” seems to be more particularly applied. The “Rock Island” car which plaintiff was inspecting was standing on track No. 2 at a point 1,439 feet below the scale, with other “dead” cars both above and below it. The point at which cars on the scale track clear the main track is only about 150 feet above the scale, so that, when a string of cars of any considerable length is brought in to be weighed, they must necessarily, after being weighed, be shoved on, past the scale, down track No. 2; and in this instance there were 12 or 14 of such cars which were so shoved, and, it is said, uncoupled from the locomotive (that was behind them) and “kicked,” down the track and grade, with no one aboard of them, until they collided with the dead cars, of which the Rock Island car was the fifth or eighth in the line, thereby starting that car in motion and causing the accident.
Defendant’s “Rule XXVI,” shown to be practically the same as that of other railroad companies entering Shreveport (and probably of all such companies in this country), reads:
“A blue flag by day and a blue light by night, displayed at one or both ends of an engine, car, or train, indicates that workmen are under or about it. When thus protected, it must not be coupled to or moved. Workmen will display the blue signals, and the same workmen alone are authorized' to move them. Other cars must not be placed on the same track, so as to intercept the view of the blue signal, without first notifying the workmen.”
An employé’s “service card,” upon which plaintiff and all other workmen were required to make daily reports of the time made by them, contains the following, printed in large, clear type upon the back, to wit:
“If your duty requires you to go around, under, or on cars in any track, protect yourself with a blue signal.”
Plaintiff, in the course of his testimony, denied repeatedly that he knew of the existence of any rule requiring the use of blue flags, or signals, but finally, when shown a number of service cards that had been turned in by him, admitted that he had read the “notice” printed on their .backs, and knew that the paragraph quoted was a rule of the company, but said:
“How are you going to do that [protect yourself with a blue signal when your duty requires you to go around, under, or on cars, on any track] when they don’t furnish you with any signals?”
And he denied that any signals had ever been furnished him, and specifically denied that he had any blue flag in the “shanty” (the “shanty” being a little place, such as the name indicates in the yards, that he used as his office). It was then shown, on the cross-examination of his assistant, Meyer (who was evidently reluctant to make the ad *199 mission), that there was a blue Sag in the “shanty”; and it was also shown, by the testimony of Reed, the car foreman, that plaintiff could have obtained a blue flag at any time by asking for it, and that he made no such request.
It was further shown, by the testimony of defendant’s superintendent, that he at one time observed plaintiff’s assistant, Kelly, under a car on a loading track, though no blue signal was displayed; that he called him out, and asked why he was not using the flag, to which Kelly replied that he knew where the switch engine was and didn’t think it necessary; and that he (the superintendent) took the matter up vigorously with the master mechanic.
The car foreman refers to the same occasion in his testimony, and states at one time that he spoke to plaintiff about it “in a casual way,” and at another time as follows :
“I told him, in substance, that it would he necessary that we keep that flag out; that the company demanded it for their protection, and for his protection. What I meant by ‘a casual way’ was this: You always get the best results with Mr. Abshier by talking to him in an easy way; he is that kind of a man. * * * Q. Did you tell Mr. Abshier of the trouble that had been caused by Mr. Coppage [the superintendent] discovering Kelly, or the other man, under a car out at the freight shed? A. Yes, sir. * * * Q. Did Mr. Abshier say anything in reply to you, when you told him that the company was demanding that the blue flags be used for its own protection and for the protection of its employes? * * * A. He did not resent it — he might have said ‘O. K.,’ or ‘All right,’ or something like that. Q. Did he say anything, at that time, about not having any blue flags? A. No; I don’t think that question came up; but I did ask the boy at the shop if he had a blue flag. Q. What boy was that? A. The Kelly boy. * * * Q. Did he say that he had? A. Yes, sir; that there were some down there.”
Plaintiff, cross-examined upon the same point, at first stated that he did not remember the “row” raised by Mr. Cóppage about Kelly’s failure to display the blue flag; but his further examination reads:
“Q. You don’t remember, in 1912, when Mr. Coppage found Kelly under a car without a blue flag and jumped on him about it, and took it up with the vice president of the company and with the master mechanic, and they came down and made an investigation of the matter? A. Yes, sir. Q. Then there were flags used in the yard? A. I have never seen any. Q. And still they jumped on Kelly for not using a flag? A. Yes; and I went and told them that there were flags there. Q. The reason they didn’t furnish you with any flags was because you told them that you had flags there? A. Well, I told Mr. Marshall that there were flags there, and then I went and made a demand on the master mechanic and did not get any.”
It is shown that the person to whom plaintiff should have applied for blue flags was the foreman of the shop, and he testifies that no such application was made. The master mechanic, at the time of the accident, and of the trial, was Nicholson, who, of course, knew nothing of any application said to have been made to Ms predecessor in 1912 or 1913, but he testifies that blue flags were always to be had, and, if not on hand, would be obtained. Meyers, however, was plaintiff’s assistant and witness, who had left defendant’s employ after the accident (as suggested in the course of the examination, because he was not promoted to the vacant position), and had, thereafter, been unsuccessful in an attempt to get back into Ms old place, and he testified, rather reluctantly, as we have stated, that there was a blue flag in the “shanty” at the time of the accident. The truth, as we conclude from all the testimony on the subject, is that blue flags are not used by inspectors for one or the other of two reasons, viz.: In many — perhaps most — instances, their work may be done without requiring them to go under the cars; or, where it is necessary to go under a. car, the inspection may be made in so short a time that they prefer to ignore the rule and take the risk of inspecting without the blue flag, rather than the time and trouble that would be required to get it, for mere momentary use. In fact, plaintiff’s position, throughout Ms testimony, is that blue flags were not used in the inspection of cars, and it required con *201 siderable cross-examination to induce him to admit, first, that he knew of any rule upon the subject, and then that he would have used a blue flag, even if he had had it; the latter admission being coupled with a denial that any such flag was furnished to him, a denial which is entirely overborne by the testimony to which we have referred.
It is further shown that Doyle, who is employed by defendant to investigate claims of this character, called on plaintiff about two weeks after the accident and obtained a statement, or partial statement, from him, in answer to certain questions printed upon a form used for that purpose, but concerning which plaintiff testifies that he did not sign it, because it does not contain all the facts, and, because he was not in a physical condition to affix his signature. He further testifies, on cross-examination, as follows:
“Q. Mr. Abshier, you saw that the statement that Mr. Doyle took does not contain all the facts: the facts that were given, those that were told him, he wrote down? A. Yes, sir; retty well all of them, I think. Q. Then what o read, as having been stated by you to him, was stated, was it? A. Yes, sir.”
Referring to Doyle’s testimony, we find that “what he read,” and what plaintiff thus admitted that he (plaintiff) had stated, included the following (the witness reading the printed questions from the form used by him, and the answers as given by plaintiff and taken down by the witness), to wit:
“Q. Did you propound the questions on that form to Mr. Abshier? A. Yes, sir. Q. Referring to question 8, what question did you ask him there (indicating)? A. ‘State cause of injury and give full particulars how the accident occurred.’ * * * Q. Did he answer it? A. Yes, sir; in this way: ‘Was standing between two ears, looking at draft sill in Rock Island car; looked out; brought up the engine, so it would cut off the cars, and, when I was stepping down, my leg struck cut of cars and threw me across the rail.”
It is evident, we think, that the answer as read by the witness was erroneously taken down, or transcribed, by the stenographer, for, as it appears upon the instrument from which the witness was reading, and which has been copied in the record, the answer appears:
“Was standing between two cars, looking broken draft sills in Rock Island car. Looked up towards scales. ..Saw engine with cut of cars. Thought they were weighing. When I was stepping down, looking, struck cut of cars I was at. Threw me across rails; wheel struck me, and I shoved myself in middle of track. Axle then struck me, and I jumped out on south side of track, and got my body all in clear, except left leg.”
Which, taking it to mean that, while plaintiff was stooping down, between the two cars, looking, the engine with cut of cars, coming from the scale, struck the cut of cars in which he was working, is a perfectly intelligible, and, as we believe, truthful, explanation of the accident. On the other hand, the descriptions, or statements, of his position, which plaintiff gives in his petition, and his testimony, can hardly be considered intelligible, but, if susceptible of being understood, are in direct conflict with the statement made to Doyle, and are wholly improbable, not to say incredible. Thus he alleges in his sworn petition:
“That he did then and there place himself between the bottom of the car and the top of the wheels or trucks under the end of said car for the purpose of examining what is commonly known as and called the center pin,” etc.
And his testimony upon the subject reads (on his examination in chief);
“Q. What position did you have to place yourself in, in order to inspect the car properly? A. Had to mighty near got under the car to see the center pin. Q. Explain what are the center pins? A. They are the pins that come down through the center of the car and hold the trucks that carry the load of the car. * * * Q. Now what is the position of that pin with reference to the truck? Where does it come in contact with the truck? A. In the center of the truck. * * * Q. You placed yourself under the ear there? A. Yes, sir; had to. * * * ”
On cross-examination:
“Q. Are blue flags used by railroads for some purposes? A. Used on rip tracks, but never used in inspecting cars. Q. Never used, except on rip tracks? A. No, sir; I never did; never saw one used in inspecting cars. Q. What is *203 a blue flag used for? A. It is to protect workmen when working under cars on the rip track. * * * Q. Does this rule specify that it is to be used only on the rip track? A. I do not know about that. Q. The reason for using the blue flag on the rip track is to let the switchmen and switching crews know that there is a man under the car? A. Yes, sir; I suppose so. Q. Then, if a man gets under a car, to inspect it, or to repair any cars, on a side track, would you not think that the same rale would apply for the protection of the man? A. If he had a flag to put out, it might; but we did not have any. Q. Then the purpose of a blue flag, to protect a man under the cars, would apply just as well on cars, or on any cars, when he gets out of sight under the cars? A. A man is not supposed to get out of sight in inspecting cars. Q. You were out of sight? A. No, sir; they could have seen me. Q. You were under the car? A. Part of me. Q. What part? A. About from my waist up was under, and my legs were out, and, when [I was?] knocked down, went across the rail. Q. How did you enter that car; from the side or from the end? A. From the end, right about under the wheel. Q. From the end? A. Yes; from the end, there; climbed up on the wheel, right by the end, there — by the wheel. Q. Went in between two cars and got on the truck in that way? A. No, sir; I was up against the side of the wheel, leaning up against the side of the wheel. Q. You allege in your petition, and which is sworn to by you personally, that you placed yourself between the bottom of the car and the top of the wheels on the truck? A. That is what I said. I was leaning up in the wheel, between the wheel and the truck. Q. Between the bottom of the car and the top of the wheel, or the truck? A. Yes, sir.”
Another answer, which was read by Doyle, and which plaintiff admits that he gave, to the question:
“State here any other information that you may have that you believe will be beneficial in assisting the company to arrive at a proper conclusion as to how this accident occurred”
—reads as follows:
“I was examining the draft sill under the Rock Island car, to see if it would be safe to run down.”
In that connection, it may be here stated that plaintiff had inspected the Rock Island car in question on February 17th (three days before thei day of the accident), and appears to have passed it. It was, however, subsequently inspected by Saunders, an inspector employed by all of the railroad companies entering Shreveport, at what is called the Shreveport Joint Car Interchange and Inspection Bureau, who found that the sills were broken, and sent it back to defendant’s yards on that account. Saunders, who was called by plaintiff and testified very strongly in his favor, nevertheless develops the following on his cross-examination:
“Q. Mr. Saunders, this was a C., R. I. & P. car 57805? A. Yes; 57805 C„ R. I. & P. Q. Bad order, and found the glass sills were broken, did you not? A. Yes, sir. Q. Now you didn’t find anything the matter with the center pin, did you? A. No, sir. Q. That was all right, so far as your inspection went? A. Yes, sir; as far as I knew. Q. -And you tagged it bad order, and your tag showed what the trouble was? A. Yes, sir.”
Mr. Saunders further testifies that, although he is in the employ of all the companies, he has never read the rules of any of them, except those of the Texas & Pacific, and has never asked for any, and his cross-examination then proceeds as follows:
“Q. Now, I understand you to interpret the rule of the T. & P. as applying to workmen? A. Yes, sil’. Q. Now that rule reads: ‘If your duty requires you to go around under cars, you should protect yourself with the blue signal.’ Now, you are familiar with that? A. I have never read it. Q. That don’t say workmen, does it? A. Well, I had never read it. Q. If your duty requires you to go around, under, or on cars on the track, you should protect yourself with the blue signal? A. Well, you couldn’t live up to that to save your life. Q. Well, suppose you are clear up under a car, and you can’t be seen— A. That rule says— Q. In this case, we are applying this rule to a man who gets under a car? A. Well, I don’t see why he should do that. Q. If the car was on the switching track, would you think it safe, where a man is on a switch track, would you think it safe — such as No. 2, where the cars are switching, and shoved down from the scale track, do you think it safe for a man to get up under a car there, like Mr. Abshier said he did, without taking some precaution for his own safety, by the use of the blue flag, or something-like that? A. Well, I don’t know whether it is safe or not; we do it every day. Q. Is it safe? A. No. Q. He is taking a chance? A. He is taking a chance every way.”
And lie goes on to speak of an instance in which, as he intimates, an engineer had deliberately disregarded a blue signal and knocked him seven car lengths, and says that the engineer was never reported, and would *205 not have been discharged if he had been reported.
The matter of plaintiff’s position when the accident occurred is not the only one in which his allegata and probata fail to agree. The second question asked him by his counsel, after he had been placed on the stand, was, to state what he was doing on February 20, 1914, and he answered, and his examination proceeded as follows:
“A. About 2:39 on the 20th day of February, I closed [the word used was probably ‘repaired’] the side door on a car on the L. R. & N. yard, and the yardmaster came to me and told me to go and look at a bad order car and see if it could be fixed up so as to ship it south; told them the day before to take it to the rip track. I asked him when he was going to the T. & P. and he said he was going ‘now’; and I told him I would go while they were gone to the T. & P. He started to the T. & P., and I went to look at the car, and I got under there and looked at the brake draft sills, and, instead of going to the T. & P., they threw the cars back on me and knocked me down, and, in the fall, I jumped up to get in between the cars, and it caught me and cut my leg off. * * * Q. They sent cars from that track to the T. & P. [meaning Texas & Pacific yards]? A. Yes, sir. Q. What did you tell him? A. I told him that I would go and inspect the car while he was gone to the T. & P. * * * Q. You went right on? A. Yes, sir. * * * Q. You went immediately to do this after you had received the directions from the yard foreman? A. Yes, sir; right straight. * * * Q. How long were you under the car, inspecting it, before those cars were shoved in on you? A. Between 8 and 10 minutes, I suppose. * * * Q. He didn’t go to the T. & P. with the cars that he told you about? A. No, sir; he did not.”
Mr. Saunders, the witness to whom we already referred, testifies that he was in defendant’s yards about the time of the accident, and as follows:
“Q. Did you hear the yard foreman talk to him [plaintiff] that day about going over to the T. & P.? A. No, sir; I never heard him talk about going to the T. & P.; about going to the T. & P., yes, I heard him. Q. What did you hear him say about it? A. Well, he said ho was going over to the T. & P., and Abshier was there, and he said he would go down and look at this Rock Island car. As well as I remember, there was something said about the Rock Island car, and Abshier was to look at that while he was gone to the T. & P.”
On cross-examination:
“Q. When this conversation took place, who was it talking in regard to going over to the T. & P.? A. Well, I asked him when he was going to the T. & P., and he said, ‘In a few minutes.’ * * * Q. When was that? A. About 2:30. * * * Q. Now, who was present when that conversation took place? A.- Well, Mr. Abshier and Mr. Meyers were standing close to there. I walked up and said: ‘When are you going to the T. & P.?’ And he said: ‘In a few minutes.’ * * * Q. When you had your conversation there, and you all left, and you stopped talking, he went on the main line there, and you went across? A. Yes, sir. * * * Q. Now, you did not hear any further conversation between Mr. O’Malley [the yardmaster] and Mr. Abshier? A. I heard talk about the car; I don’t know what the reference to the car was. Q. Before or after your conversation? A. Before. Q. Where were you then? A. Going to see Mr. O’Malley; he was talking there, and I heard them say something about the bad order car, and then I asked him when he was going to the T. & P., right in front of Ab-shier.”
Meyers’ testimony on the subject reads as follows:
“Q. I will ask you to state whether or not you heard any conversation between the yard foreman and Mr. Abshier? A. * * * Mr. Ab-shier asked the yard foreman if he was going to the T. & P., and he said that he was, and about that time I had to go to the scale house and get some polish. Q. What did Abshier tell him ? A. He told him he was going to cross to No. 2 to inspect a car. * * * ”
On cross-examination:
“Q. Who else was there besides Mr. O’Malley and Mr. Abshier when this conversation took place? A. Well, I don’t know whether the switching crew was there or not. They might have been there, but I don’t know. * * * Q. Now, I believe you said that the conversation that took place was that Mr. O’Malley told Mr. Abshier that he was going over to the T. & P., and Mr. Abshier told Mr. O’Malley that he was going to No. 2 to inspect a car. A. Yes, sir; the car had come in on Interchange. Q. Was that the conversation that took place? A. Yes, sir; that is all I heard; I left there then.”
Meyers had also been interviewed by Doyle, on the day of, or day after, the accident, and had made and signed a statement which included the following:
“I had been walking around in the yard with Rabbit [meaning plaintiff] all the evening, prior to the accident. We finished repairing a door on a car on the main line. I walked up to the scale track; in fact, when I left Abshier, he *207 was still working on the door. I had walked up to the scale house to get some weights]?) to stencil a car, and had not left him over five minutes when I saw that he had been hurt. He evidently had just walked over to the track on which he was hurt, for, as above stated, I had not left him over five minutes. I had not heard him say anything about the R. I. bad order car, and did not know he intended going over to it.”
O’Malley testifies that he had a passing conversation with Abshier some time after 2 o’clock, on the day of the accident, but. did not say to him or to Saunders that he was going over to the T. & P.; that he was not making up any cars to take over there; that, according to his recollection, the time for delivering cars at the T. & P. yards expired at 2 o’clock; and had passed when he talked to Abshier. And he is corroborated, as to the matter last mentioned, by Mr. Higginbotham, defendant’s local freight agent at Shreveport, and is wholly uncontradicted.
Opinion.
In Roux v. Morgan’s La. & Tex. R. & S. S. Co., 127 La. 240, 53 South. 550, it appeared that defendant had rules identical in terms with those which have been hereinabove quoted; that Louis Torres, employed as a carpenter and car repairer, was furnished with blue flags wherewith to protect himself while working around, under, or on cars, and lost his life by reason of his failure to make use of them, and it was held that defendant was not liable in damages therefor. It was said in the course of the opinion:
“It is not shown that this rule [referring to a rule corresponding to defendant’s rule 26] was ever specifically brought to the notice of Torres, or that he was furnished with a copy of the book of rules in which it is contained; but it was shown that he had been in defendant’s employ for four years, and that he was given time cards bearing the printed notice, which, at the beginning of his employment, was read to him by one of the officers of the defendant company, to wit: [Being the same notice that is printed on the time cards that were given to, and used by, the plaintiff herein, and with which he admits that he was familiar.]”
The conclusion reached by the court, as to the law of the case, is stated in the syllabus as follows:
“Where a car repairer goes to work on a car, on a railroad track, without putting out proper signals, with which he is provided, and the use of which he knows, to prevent collision by other cars, whilst he is so engaged, there can be no recovery of damages for injuries sustained by him the fault is his.”
We can discover no reason why the same law should not be applied in this case. To the contrary, the reasons for its application are stronger than in the case cited; for here the person who, for his own protection as well as for the protection of his employer, assumed a certain obligation, and who now seeks to hold his employer liable in damages for an injury sustained by him in consequence of his violation thereof, was somewhat a person in authority, and owed it to nis employer to comply with his obligation, not only because he had so agreed, but as an example to others, and particularly to those who were placed under his authority. The rule, and the reasons of the rule, which require a signal to be displayed by an employs who is engaged in work around, under, or on a car, standing upon a railroad track, are none the less applicable in the case of one who goes under a car in order to inspect it than in the case of one who assumes that position for any other reason, and as plaintiff herein, for every day that he worked, signed and turned in to the defendant a card in which he recognized that fact, defendant had the right to assume that he was not only observing, but, as to his assistant, was enforcing, that rule.
The evidence fails to satisfy us that plaintiff, or any part of his person, was reasonably visible, in either of the positions which he attempts to describe, to a person on a car, or train, approaching from the direction of the scale, or that the yardmaster understood, or could have been expected to understand, even though we should assume that he knew *209 plaintiff’s purpose was to inspect the R. I. car, that he intended to disappear beneath it, and, in so doing, violate the rule of their common employer by failing to display a blue flag. In that view of the matter, it is unnecessary for us to consider whether, if plaintiff and the yardmaster had deliberately agreed that the rule should be disregarded, their employer could be required to pay the penalty.
Our conclusion being that plaintiff is not entitled to recover it is ordered and decreed that the judgment in his favor be set aside and annulled, and his demands be rejected, and that this suit be dismissed, at his cost in both courts.
SOMMERVILLE, J., takes no part.